IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

| | | |
|---|---|---|
| ARTHUR LAWTON CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 317-025 |
| | ) | |
| LYNN SHEFFIELD, Sheriff; LT. TOMMY | ) | |
| BARRENTINE; and DR. PETER WROBEL, | ) | |
| | ) | |
| Defendants. | ) | |

_____

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
_____

Plaintiff, an inmate at Autry State Prison in Pelham, Georgia, is proceeding *pro se* in this civil rights case. Before the Court is Defendants' motions for summary judgment. (Doc. nos. 46, 49.) For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** the motions for summary judgment be **GRANTED**, a final judgment be **ENTERED** in favor of Defendants, and this civil action be **CLOSED**.

**I. PROCEDURAL BACKGROUND**

On May 4, 2017, Plaintiff filed this case against Defendants (1) Lynn Sheffield, Sheriff ("Shf."); (2) Tommy Barrentine, Lieutenant ("Lt."); and (3) Dr. Peter Wrobel. (Doc. no. 1, p. 1.) Plaintiff is bringing Eighth Amendment deliberate indifference to serious medical needs claims against all Defendants for his medical treatment received after a knee injury, which occurred May 12, 2015, and following a stroke occurring in late June 2015 to early July 2015. (Id. at 5, 10-13.) He seeks $1,000,000 in compensatory damages. (Id. at 6.)

The case proceeded through the discovery period, which ended on May 1, 2018. (Doc. no. 44.) On May 30, 2018, Dr. Wrobel filed a motion for summary judgment arguing Plaintiff cannot satisfy the subjective component of a deliberate indifference claim. (Doc. no. 46-1, pp. 9-15.) On June 1, 2018, Shf. Sheffield and Lt. Barrentine filed a joint motion for summary judgment adopting and relying on the arguments made by Dr. Wrobel and, in addition, arguing they are protected from liability because of qualified immunity. (Doc. no. 49.) Plaintiff argues summary judgment is not appropriate as to any Defendant because they were responsible for his medical care and failed to timely care for his injuries. (Doc. nos. 58-61.)

All Defendants submitted with their motions for summary judgment Statements of Undisputed Material Facts ("SMF") pursuant to Loc. R. 56.1. (Doc. nos. 46-2, 49-6.) Plaintiff filed responses to each Defendants' SMF. (Doc. nos. 58, 60.) Therefore, the Court deems admitted all facts in Defendants' SMF which find support in the record and Plaintiff has not properly opposed under Federal Rule of Civil Procedure 56. Fed. R. Civ. P. 56 (requiring citations to particular parts of materials in record, and affidavits or declarations used to oppose summary judgment motion made on personal knowledge, set out facts admissible in evidence, and show competency to testify); see Scoggins v. Arrow Trucking Co., 92 F.Supp.2d 1372, 1373 n.1 (S.D. Ga. 2000); see also Williams v. Slack, 438 F. App'x 848, 849-50 (11th Cir. 2011) (finding no error in deeming defendants' statements of material fact admitted where *pro se* prisoner failed to respond with specific citations to evidence and otherwise failed to state valid objection to statement). The Court will review each SMF "to determine if there is, indeed, no genuine issue of material fact." Mann, 588 F.3d at 1303.

## II. FACTS

### A. Defendants Sued

Shf. Sheffield was elected and has continued to serve as the Sheriff of Dodge County since 2013. (Sheffield Decl., doc. no. 49-1, ¶ 2.) He delegates administration of Dodge County Jail ("DCJ") to the Jail Administrator and his staff. (Id. at ¶ 3.) He is not a doctor and never had any personal involvement with any decision relating to Plaintiff's medical care. (Id. at ¶¶ 4-5.) He had no knowledge of Plaintiff's particular medical condition or had any reason to believe Plaintiff's medical care was inadequate. (Id. at ¶¶ 6-7.) Shf. Sheffield never had contact with Plaintiff and he usually does not have contact with inmates at DCJ. (Id. at ¶ 3.) Shf. Sheffield had no knowledge Plaintiff suffered from a stroke. (Id. at ¶ 7.)

Lt. Barrentine was serving as the interim Jail Administrator for DCJ while Plaintiff was incarcerated there. (Barrentine Decl., doc. no. 49-2, ¶ 2.) As Jail Administrator, his primary responsibility is to supervise detention officers and handle other administrative matters associated with DCJ. (Id.) Lt. Barrentine is not a doctor and had no personal involvement with the medical care involving Plaintiff. (Id. at ¶ 3.) Lt. Barrentine had no knowledge Plaintiff suffered from a stroke. (Id. at ¶ 9.)

Dr. Wrobel is a medical doctor licensed in the state of Georgia. (Dr. Wrobel Aff., doc. no. 46-3, ¶ 2.) He is the owner and Medical Director of Southern Correctional Medicine ("SCM"). (Id. at ¶ 3.) During Plaintiff's time at DCJ, SCM was contracted by DCJ to provide inmates with medical care. (Id.; Barrentine Decl., ¶¶ 3, 6-7.) If an inmate had a serious untreated medical condition, DCJ officers were trained to respond to emergencies and contact SCM to evaluate and treat the inmates' conditions. (Sheffield Decl., ¶¶ 6-7;

3

Barrentine Decl., ¶¶ 6-7.) Dr. Wrobel oversaw Plaintiff's medical care and personally examined Plaintiff while he was at DCJ. (See Wrobel Aff., ¶¶ 4-21.)

### B. Plaintiff's Injuries and Medical Care

On May 12, 2015, Plaintiff was injured in an altercation while being arrested by Dodge County Law Enforcement for being a suspect in a shooting. (Doc. no. 54-2.) Dodge County EMS arrived on the scene because Plaintiff complained of an injury to his right knee. (Id.) After initially examining Plaintiff, Dodge County EMS drove Plaintiff, accompanied by Dodge County deputies, to Dodge County Hospital ("DCH") for treatment. (Id.) Upon arrival at DCH, an emergency physician treated Plaintiff. (Doc. no. 54-3.) The physician initially diagnosed with a knee and chest contusion. (Id.) Plaintiff was given 300mg of Zantac and his injured knee was placed in an immobilizer. (Id.; doc. no. 54-1, pp. 130-34.) The physician noted Plaintiff's symptoms of knee and chest pain and no significant fracture, questionable irregularity at medial tibial plateau. (Doc. no. 54-3.)

X-ray showed "a severely comminuted depressed fracture of the lateral tibial plateau. . . . There [was] 3-4 mm lateral displacement of the lateral fragment." (Doc. no. 54-1, p. 151.) X-ray also showed Plaintiff had a "minimally displaced fracture of the anterior aspect of the right 7th rib." (Id. at 153.) Plaintiff was instructed to take three Tylenol or Advil per day as needed for pain, follow up with a doctor if symptoms persisted, and wear an immobilizer until cleared by an orthopedic. (Id. at 147.) After treatment at DCH, Dodge County law enforcement transported Plaintiff to DCJ.

Upon arrival to DCJ, Plaintiff consented to having SCM, which handled medical care at DCJ, (Wrobel Aff., ¶ 3), undertake all further medical treatment of Plaintiff. (Doc. no. 54-

4

5.) On May 13, 2015, Plaintiff was examined by Deborah Stewart, Family Nurse Practitioner ("FNP") for SCM, because of a possible tibia fracture on Plaintiff's right leg. (Doc. no. 54-6.) After the examination, she encouraged Plaintiff to avoid putting pressure on his right leg, instructed Plaintiff's knee remain in an immobilizer, and prescribed him numerous medications for blood pressure and pain. (Id.)

On May 16, 2015, Plaintiff filed his first grievance form requesting medical attention "a.s.a.p." (Doc. no. 54-7.) On May 18, 2015, Plaintiff was seen by Ms. Stewart again for right knee pain and swelling, which prompted her to order an x-ray for further evaluation. (Doc. no. 54-8.) The x-ray occurred on May 20, 2015, and showed a medial aspect of the medial tibial plateau with slight inferior displacement. (Doc. no. 54-9.) Ms. Stewart reviewed the results on May 22, 2015, and she set a date for Plaintiff to meet Dr. Wrobel. (Id.)

Dr. Wrobel first examined Plaintiff on May 26, 2015. (Doc. no. 54-10.) Dr. Wrobel confirmed Ms. Stewart's diagnosis as shown by the May 20th x-ray. (Id.) Dr. Wrobel referred Plaintiff to Dr. Donald Rosenbaum for an orthopedic consultation and ordered Plaintiff stop taking ibuprofen and blood pressure medication in anticipation for the consultation with Dr. Rosenbaum. (Id.)

On May 28, 2015, Dr. Rosenbaum examined Plaintiff. (Doc. no. 54-11.) Dr. Rosenbaum examined Plaintiff's knee and looked at the x-rays taken when Plaintiff was first admitted to DCH on May 12, 2015. (Id.) Dr. Rosenbaum confirmed the diagnosis stated at DCH and by Dr. Wrobel. (Id.) He concluded Plaintiff had a "right knee lateral displaced intraarticular lateral tibia plateau fracture." (Id.) Dr. Rosenbaum discussed the diagnosis

5

with Plaintiff and told him surgery was needed as soon as possible to reconstruct his lateral tibial plateau fracture. (Id.) During that visit, Dr. Rosenbaum ordered a CT scan of Plaintiff's right knee for preoperative planning purposes in preparation for the surgery on Plaintiff's knee. (Id.) While waiting for the CT scan and then subsequently the surgery, Dr. Rosenbaum ordered Plaintiff to keep off his right leg, wear the knee immobilizer, and take ibuprofen and Tylenol. (Id.)

The CT scan was initially scheduled for May 29, 2015, but it was cancelled because of an anticipated transfer of Plaintiff to a different facility. (Doc. no. 54-12.) However, on June 3, 2015, Plaintiff's transfer was cancelled, and the CT scan occurred on June 4, 2015. (Id.) On June 5, 2015, Plaintiff was approved for surgery, which was scheduled for June 9, 2015. (Id.) Dr. Rosenbaum performed surgery on Plaintiff's right knee on June 9, 2015, at DCH. (Doc. no. 55-1.)

On June 15, 2015, Dr. Wrobel examined Plaintiff for a follow-up after his surgery. (Doc. no. 55-3.) Dr. Wrobel prescribed Tramadol and a multivitamin in addition to advising Plaintiff to obtain instructions from Dr. Rosenbaum so Plaintiff could begin physical therapy. (Id.) On July 6, 2015, Plaintiff was again examined by Dr. Wrobel for a follow up after his right knee surgery. (Doc. no. 55-4.) Sometime in late June to early July, Plaintiff suffered a "mild stroke." (Doc. no. 60, pp. 13-14; doc no. 62-1, p. 15.)

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56(a). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*). On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Id. at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981). Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (quoting Adickes, 398 U.S. at 158-59). A

genuine dispute as to a material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

### B. Dr. Wrobel is Entitled to Summary Judgment Because Plaintiff Cannot Establish an Eight Amendment Violation

Defendants argue at summary judgment Plaintiff cannot show Defendants knew of or disregarded Plaintiff's serious medical needs and Defendants did not cause an injury to Plaintiff. (See doc. nos. 46-1, pp. 9-15; 49-7, pp. 10-13; 49-8, pp. 12-15.) Additionally, Shf. Sheffield and Lt. Barrentine each argue (1) Plaintiff also failed to establish a serious medical need existed and (2) they cannot be held liable because of qualified immunity. (Doc. nos. 49-7, pp. 5-10; 49-8, pp. 6-11.) Plaintiff argues summary judgment is not appropriate because: (1) the fracture to his knee was a serious medical need; (2) Defendants failed to provide adequate and timely care to Plaintiff's injured knee; (3) Defendants' lack of adequate and timely care caused Plaintiff to suffer in pain from the fracture; (4) Defendants did not properly treat Plaintiff for a stroke. (See doc. nos. 58-1, 59.)

#### 1. Deliberate Indifference Standard

To prevail on a claim for deliberate indifference to a serious medical need, Plaintiff must prove that: (1) he had a serious medical need – the objective component, (2) a defendant acted with deliberate indifference to that need – the subjective component, and (3) his injury was caused by a defendant's wrongful conduct. Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007); see also Thomas v. Bryant, 614 F.3d 1288, 1317 n.29 (11th Cir. 2010).

To satisfy the objective component regarding a serious medical need, a prisoner must

8

demonstrate that his medical need "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Goebert, 510 F.3d at 1326 (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994)). To satisfy the subjective component, Plaintiff must show a defendant: (1) was subjectively aware of a serious risk of harm and (2) disregarded that risk (3) by following a course of action which constituted more than mere negligence. Id. at 1326-27.

The Eleventh Circuit has consistently held that a mere difference of opinion between an inmate and prison medical officials over a diagnosis or course of treatment does not support a claim of deliberate indifference. See Smith v. Fla. Dep't of Corr., 375 F. App'x 905, 910 (11th Cir. 2010). Furthermore, the Court should not second-guess medical judgments. Wallace v. Sheriff, 518 F. App'x 621, 622-23 (11th Cir. 2013); Smith, 375 F. App'x at 910 ("[W]hether governmental actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment."). The Eighth Amendment does not mandate that the medical care provided to the prisoner "be perfect, the best obtainable, or even very good." Harris v. Thigpen, 941 F.2d 1495, 1510 (11th Cir. 1991) (quoting Brown v. Beck, 481 F. Supp. 723, 726 (S.D. Ga. 1980) (Bowen, J.)). However, when medical care is provided, there still may be deliberate indifference "by delaying the treatment of serious medical needs, even for a period of hours," but the Court will look to the "reason for the delay and the nature of the medical need" to determine what

type of delay is constitutionally intolerable. McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999.)

> **2. Plaintiff Established the Existence of a Serious Medical Need Because His Knee was Fractured and Required Treatment, Including Surgery, From Physicians**

Plaintiff suffered from a "right knee lateral displaced intraarticular lateral tibia plateau fracture." (Doc. no. 54-11.) Put simply, Plaintiff's knee was fractured. (See doc. no. 46-1, p. 16; doc. no. 49-7, p. 9.) To satisfy the first prong on summary judgment, Plaintiff's injuries needed to have been either diagnosed by a physician as mandating treatment or so obviously needed treatment a lay person would recognize the need for a doctor. Goebert, 510 F.3d at 1326. Plaintiff's medical records show he was diagnosed with a knee fracture, had multiple examinations and follow up appointments with medical professionals, needed x-rays and a CT scan to understand the injury, and required surgery to fully heal his knee. (Doc. nos. 54-1 – 54-12.) Thus, viewing the evidence in the light most favorable to Plaintiff as the non-movant, the existence of a serious medical need is established because he was in fact diagnosed by multiple physicians with an injury that mandated treatment. Additionally, concerning Plaintiff's stroke, neither party argues a serious medical need did not exist. Therefore, the Court assumes Plaintiff's stroke was a serious medical need.

Shf. Sheffield and Lt. Barrentine argue there was no serious medical need because Plaintiff was treated. (Doc. no. 49-7, p. 9; doc. no. 49-8, p. 11.) However, it is clear Plaintiff did have two serious medical needs because both the fractured knee and stroke require a diagnosis by a physician as mandating treatment. Goebert, 510 F.3d at 1326. In Lt. Barrentine's brief, he even concedes a "broken leg requires treatment." (Doc. no. 49-8, p.

10

11.) Thus, Plaintiff has established two serious medical needs in his fracture knee and suffered stroke.

> **3. Plaintiff Fails to Establish Dr. Wrobel was Deliberately Indifferent to His Medical Needs Because Dr. Wrobel Treated Plaintiff Timely and With Adequate Medical Care**
>
> **a. Plaintiff's Fractured Knee**

Dr. Wrobel argues Plaintiff was timely and properly treated by him and his staff at SCM, and therefore, did not disregard Plaintiff's serious medical needs by following a course of action more than negligent. (Doc. no. 46-1, pp. 11-16.) Dr. Wrobel admits to treating Plaintiff on numerous occasions and diagnosing him with a fractured knee. Because he does not argue he was unaware of the serious medical need to Plaintiff, the Court only discusses whether Dr. Wrobel disregarded Plaintiff's medical needs by following a course of action which was more than merely negligent. Goebert, 510 F.3d at 1326-27.

The undisputed evidence shows Plaintiff had a total of eleven medical visits in less than two months from the date of his injury to his last follow up with Dr. Wrobel after surgery. (Doc. nos. 54- 57.) Dr. Wrobel examined Plaintiff three times within a month and a half. (Doc. nos. 54-10, 55-3, 55-4.) Dr. Wrobel's examinations consisted of confirming the diagnosis stated at DCH and shown by two x-rays, prescribing medication, referring Plaintiff to a specialist for treatment, and monitoring Plaintiff's condition after surgery. (Id.) Overall, Plaintiff's treatment consisted of being prescribed medication, receiving two x-rays and a CT scan, receiving a knee immobilizer, and undergoing surgery to repair his knee. (Doc. nos. 54-1, p. 151; 54-3; 54-9; 54-10; 54-11.) Plaintiff does not dispute medical examinations, or the treatment given. (Doc. nos. 58, 60.) Thus, it is clear from the record Plaintiff received

treatment from medical personnel, including Dr. Wrobel, and there is no evidence Dr. Wrobel's course of action in treating Plaintiff was something more than negligent. Thus, the undisputed facts amount to nothing more than a difference of opinion between Plaintiff and Dr. Wrobel, which is not a basis for a deliberate indifference to a serious medical need claim. Smith, 375 F. App'x at 910.

Plaintiff argues he should have been treated with more urgency because the emergency physician at DCH suggested Plaintiff see Dr. Rosenbaum "a.s.a.p." (Doc. no. 58-1, pp. 3-7.) Plaintiff cites his medical records from May 12, 2015 at DCH to support this argument. (Doc. no. 1, p. 11; doc. no. 58-1.) However, Plaintiff does not attach the document he relies on to any of his responses and briefs. After a thorough review of the record and, in particular, Plaintiff's medical records, the Court cannot find any document from May 12, 2015, indicating the emergency physician suggested Plaintiff see Dr. Rosenbaum "a.s.a.p." At most, the emergency physician prescribed Plaintiff medication, preformed an x-ray, placed Plaintiff's knee in an immobilizer, and requested he follow up with his doctor if symptoms persisted. (Doc. no. 54-1, pp. 130-34, 143, 147, 151; doc. no. 54-3.) One document did list Dr. Rosenbaum's name with a checked box next to it in a section titled "FOLLOW UP CARE," but nowhere on this document was there anything suggesting treatment by Dr. Rosenbaum "a.s.a.p." (Doc. no. 54-1, p. 147.) Although this document is a referral to a specialist for further treatment, Dr. Wrobel could not have erred because he did not examine Plaintiff until May 26, 2015. (Doc. nos. 54-10.) Additionally, the evidence shows Dr. Wrobel did in fact act with urgency upon examining Plaintiff

because he immediately scheduled Plaintiff to see Dr. Rosenbaum for a consultation at the very first examination. (Doc. nos. 54-10; 54-12, p. 3.)

Nor was Plaintiff's knee injury ignored during the two weeks that transpired between his emergency room visit on May 12, 2015, and his first appointment with Dr. Wrobel on May 26, 2015. On the contrary, Dr. Wrobel's nurse practitioner, Ms. Stewart, examined Plaintiff's knee on May 13, 2015, examined him again on May 18, 2015, and ordered an x-ray, reviewed the x-rays on May 22, 2015, and scheduled the May 26th appointment. (Doc. nos. 54-6; 54-7; 54-8; 54-9; 54-10.)

To support his argument the medical care was not timely, Plaintiff cites numerous cases for the proposition that a delay in treatment can amount to deliberate indifference. (Doc. no. 58-1 (citing Brown v. Hughes, 894 F.2d 1533 (11th Cir. 1990); Goebert, 510 F.3d 1312; and Brown v. Johnson, 387 F.3d 1344 (11th Cir. 2004)).) However, Plaintiff's case is distinctly different. In those cases, prisoners were not given medical treatment when promised, neglected treatment altogether, or had initial treatment withdrawn completely without reason. See generally Brown, 894 F.2d 1533; Goebert, 510 F.3d 1312; and Brown, 387 F.3d 1344. In this case, once Plaintiff was arrested he received medical treatment almost immediately from the EMS and then at DCH. (Doc. nos. 54-2; 54-3.) Afterwards, Plaintiff had numerous doctor's visits and eventually surgery. (Doc. nos. 54-57.) Although there may have been some amount of time between his injury, the EMS, arrival at DCH, and the doctor's visits, the amount of time was minimal and necessary for medical personnel to arrive and examine Plaintiff. It is clear from the record, Plaintiff received treatment almost immediately and was not neglected by any of the Defendants. Thus, given the nature of the

13

delay was to receive medical care, and Plaintiff's medical need was being treated by multiple physicians, including Dr. Wrobel, any delay in treatment was not constitutionally intolerable.

Plaintiff also cites cases involving substantial departures from accepted professional standards. (Doc. no. 58-1 (citing Roe v. Elyea, 631 F.3d 843 (7th Cir. 2011); McElligott, 182 F.3d 1248; Edwards v. Snyder, 478 F.3d 827 (7th Cir. 2007). These cases concern medical professionals either being oblivious to prisoners' worsening conditions or indolent to a prisoner's condition without reason. See generally Roe, 631 F.3d 843; McElligott, 182 F.3d 1248; Edwards, 478 F.3d 827. Plaintiff has not shown any facts similar to these situations because he was treated and monitored continuously, and his condition did not change or deteriorate, which is evidenced by the fact his x-rays and diagnoses remained the same until his knee operation. (Doc. nos. 54-1, p. 151; 54-2; 54-9; 54-10; 54-11; 55-1.) As stated above, Plaintiff's argument as to the adequacy of the treatment is nothing more than a difference of opinion between him and Dr. Wrobel, which does not amount to deliberate indifference. Smith, 375 F. App'x at 910.

In sum, Plaintiff received treatment for his knee almost immediately after being injured and was subsequently monitored up to and over a month after his knee was surgically repaired. Dr. Wrobel oversaw this treatment and specifically examined Plaintiff three times. There is no evidence indicating Dr. Wrobel's course of action in treating Plaintiff constituted more than negligence or any alleged injury was sustained and caused by Dr. Wrobel's treatment. Goebert, 510 F.3d at 1326.

### b. Plaintiff's Stroke

Plaintiff alleges he suffered a mild stroke in late June to early July 2015. (Doc. no. 1, pp. 11-12.) To satisfy the subjective component of a deliberate indifference claim, there must be evidence showing a defendant was subjectively aware of a serious risk of harm. Goebert, 510 F.3d at 1326-27. However, no evidence establishes Dr. Wrobel ever had any knowledge of Plaintiff's stroke. Dr. Wrobel began treating Plaintiff on May 26, 2015, and last saw Plaintiff on July 6, 2015. (Doc. nos. 54-10, 55-3, 55-4.) None of the contemporaneous medical records indicate Dr. Wrobel ever examined Plaintiff for symptoms of a stroke or Plaintiff ever told Dr. Wrobel he was exhibiting signs of a stroke. Therefore, because no evidence established Dr. Wrobel ever had knowledge of Plaintiff's stroke, Dr. Wrobel should be granted summary judgment on this claim as well.

### C. Plaintiff Cannot Hold Shf. Sheffield and Lt. Barrentine Liable Based on a Theory of Supervisory Liability

In addition to arguing there was no serious medical need as discussed above, Shf. Sheffield and Lt. Barrentine each argue they are entitled to qualified immunity, the subjective and causation prongs of a deliberate indifference claim cannot be established, and they cannot be liable for punitive damages. Plaintiff bases Shf. Sheffield and Lt. Barrentine's liability on being the Sheriff and jail administrator, respectively, arguing they are required to provide adequate medical care. (Doc. nos. 1, 60.) Thus, Plaintiff is trying to hold Shf. Sheffield and Lt. Barrentine liable for deliberate indifference to his serious medical need based on a theory of supervisory liability.

"Supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted); see also Rosa v. Fla. Dep't of Corr., 522 F. App'x 710, 714 (11th Cir. 2013) ("Because vicarious liability is inapplicable to § 1983 actions, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Likewise, supervisors, employers, and private contractors cannot be sued under § 1983 simply on a theory of *respondeat superior*. See Kruger v. Jenne, 164 F. Supp.2d 1330, 1333-34 (S.D. Fla. 2000) (citing Powell v. Shopco Laurel, Co., 678 F.2d 504 (4th Cir. 1982)) (explaining that employer which provided medical care for state inmates could not be sued under § 1983 on *respondeat superior* theory). Therefore, to hold Shf. Sheffield and Lt. Barrentine liable, Plaintiff must demonstrate that either (1) Defendant actually participated in the alleged constitutional violation, or (2) there is a causal connection between either Defendant's actions and the alleged constitutional violation. See Hartley, 193 F.3d at 1269 (citing Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)).

Here, Plaintiff has not shown either Shf. Sheffield or Lt. Barrentine actually participated in the alleged deliberate indifference. Rather, he argues they had to provide him with adequate medical care and could not delegate their authority to employees. (Doc. nos. 60, 61.) No evidence establishes these two Defendants were the individuals responsible for examining him or making the medical determinations as to Plaintiff's knee or stroke. (Sheffield Decl., ¶¶ 6-7; Barrentine Decl., ¶¶ 6-9.) Neither Shf. Sheffield or Lt. Barrentine were licensed practitioners of medicine. Instead, jail employees under Shf. Sheffield and Lt.

Barrentine were trained to respond to emergencies and contact SCM to evaluate and treat the inmates' condition. (Sheffield Decl., ¶ 6; Barrentine Decl., ¶¶ 6-7.)

Indeed, Plaintiff acknowledges he has been examined by medical staff at SCM and neither Shf. Sheffield and Lt. Barrentine ever conducted medical examinations. (Doc. no. 60, pp. 3-4; Sheffield Decl., ¶¶ 3-5; Barrentine Decl., ¶¶ 3, 7.) Courts have recognized that supervisory prison officials who are not medical professionals must rely on the decisions of trained medical practitioners regarding care provided to inmates. See Rutledge v. Lift, CV 307-055, 2009 WL 2842739, at *8 (S.D. Ga. July 22, 2009) (citing Waldrop v. Evans, 681 F. Supp. 840, 848-49 (M.D. Ga. 1988)), *adopted by* 2009 WL 2900276 (S.D. Ga. Sept. 3, 2009) (Bowen, J.). Both Shf. Sheffield and Lt. Barrentine did so in this case. (Sheffield Decl., ¶ 6; Barrentine Decl., ¶¶ 7-8.) Therefore, they did not participate in the alleged constitutional violation.

Nor has Plaintiff alleged the requisite causal connection between these two Defendants and the asserted constitutional violation. See Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986) (requiring an affirmative causal connection between a defendant and an alleged constitutional violation). The "causal connection" can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," Brown, 906 F.2d at 671, or when "the supervisor's improper 'custom or policy . . . result[s] in deliberate indifference to constitutional rights.'" Hartley, 193 F.3d at 1269 (quoting Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991)). The standard for demonstrating "widespread abuse" is high. In the Eleventh Circuit, "deprivations that constitute widespread abuse sufficient to notify the

17

supervising official must be *obvious, flagrant, rampant and of continued duration*, rather than isolated occurrences." Brown, 906 F.2d at 671 (emphasis added). A causal connection may also be shown when the facts support "an inference that the supervisor [or employer] directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).

Plaintiff has failed to present any evidence of a widespread problem with medical care at DCJ or SCM, let alone evidence putting Shf. Sheffield and Lt. Barrentine as supervisory Defendants on notice of such a problem. Concerning Plaintiff's knee, he contends Shf. Sheffield and Lt. Barrentine were aware of his knee injury because they were in charge or supervised DCJ and Lt. Barrentine handled Plaintiff's grievances. (Doc. no. 60, p. 1-3.) There is no evidence Shf. Sheffield knew anything other than Plaintiff's knee injury was being treated by SCM. (Sheffield Decl., ¶¶ 3-5.) Also, Plaintiff cannot establish liability merely because he filed a grievance or appeal upon which Defendants ruled. See Asad v. Crosby, 158 F. App'x 166, 170-72 (11th Cir. 2005) (affirming district court's dismissal of supervisory liability claims against two defendants who failed "to afford [plaintiff] relief during the grievance process," because record failed to show that they "personally participated in the alleged constitutional violations, or that there was a causal connection between the supervisory defendants' actions and an alleged constitutional violation"); see also Blackerby v. McNeil, No. CV 307-071, 2008 WL 2047814, at *1-2 (S.D. Ga. May 13, 2008) (dismissing claim against prison official who allegedly failed to act in accordance with plaintiff's wishes concerning information in grievance and a letter)

(Bowen, J.); Crowder v. Lash, 687 F.2d 996, 1005-06 (7th Cir. 1982) (rejecting claim that Commissioner of Department of Corrections could be held liable for damages from any constitutional violation at facility within his jurisdiction based on receipt of letter describing allegedly improper prison conditions); Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999) (refusing to impose liability under § 1983 on supervisory officials who denied administrative grievances and otherwise failed to act based on allegations contained in grievances), *cert. denied*, 530 U.S. 1264 (2000).

There is no evidence either Defendant knew anything about Plaintiff's stroke. (Sheffield Decl., ¶¶ 7-8; Barrentine Decl., ¶ 9.) Plaintiff never alleged either Defendant knew of the stroke, (doc. no. 1, pp. 11-13), and he has failed to provide any opposing affidavit, declaration, or objective evidence as contemplated by Federal Rule of Civil Procedure 56 showing Shf. Sheffield and Lt. Barrentine ever were aware of any stroke suffered by Plaintiff let alone a widespread problem at DCJ.[1] Therefore, Plaintiff's deliberate indifference claim as to his stroke fails as well.

In sum, Plaintiff has not shown Shf. Sheffield and Lt. Barrentine actually participated in the alleged constitutional violation; nor has he drawn the necessary causal connection to any alleged constitutional violation. As Plaintiff has improperly attempted to hold Shf. Sheffield and Lt. Barrentine liable based solely on their supervisory positions, Shf. Sheffield and Lt.

---

[1] Federal Rule of Civil Procedure 56 requires a party disputing a fact to cite "to particular parts of materials in the record," and an affidavit or declaration used to oppose a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(1) & (4).

Barrentine's joint motion for summary judgment should be granted. Additionally, because Defendants should be granted summary judgment on the merits of Plaintiff's claim, the Court need not address Shf. Sheffield and Lt. Barrentine's arguments on qualified immunity or punitive damages.

### III. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** the motions for summary judgment be **GRANTED**, (doc. nos. 46, 49), a final judgment be **ENTERED** in favor of Defendants, and this civil action be **CLOSED**.

SO REPORTED and RECOMMENDED this 18th day of January, 2019, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA